UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE MALEY,

                Plaintiff,

v.

NATHAN WELCH,

                Defendant.

_____/

Case No. 16-10744

Paul D. Borman
United States District Judge

R. Steven Whalen
United States Magistrate Judge

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On October 1, 2015, Defendant Nathan Welch, a St. Clair County Sheriff's deputy, went to the home of Plaintiff Jamie Maley to investigate a complaint by her teenaged son JB that she had physically abused him the night before. Based on his conversations with JB and with Plaintiff, Defendant decided to allow JB to temporarily stay with his father (Plaintiff's ex-husband, who shared legal custody of JB with Plaintiff) while the Michigan Department of Health and Human Services' Child Protective Services division ("**CPS**") investigated the incident. Defendant dictated his report of those conversations into his digital audio recorder, directing the typist who would receive the recording to forward a copy to CPS. Defendant then docked his recorder in a transmitter and left on vacation, unaware that a technical error had prevented his report from transmitting. After several days of

calling various municipal and state agencies, Plaintiff was finally able to motivate the St. Clair County Sheriff's Office to track down Defendant's report and send it to CPS, which immediately initiated an investigation. JB was returned to Plaintiff's custody before the CPS investigation finished, twelve days after the initial incident.

Plaintiff brought this lawsuit pursuant to 42 U.S.C. § 1983 against Deputy Welch and the County of St. Clair. She subsequently dropped the claims against the County, leaving only one procedural due process claim and one substantive due process claim, each asserted against Defendant Welch, in the action.

Both parties have moved for summary judgment. For the reasons below, the Court finds that Plaintiff's claims against Defendant are barred under the doctrine of qualified immunity. For that reason, the Court will deny Plaintiff's Motion for Summary Judgment, and grant Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Facts

#### 1.    Background

Plaintiff lives in Lynn Township, Michigan with two of her three children and her husband Philip Maley. (ECF No. 19, Def.'s Mot. Ex. 1, Deposition of Jamie Maley ("Plaintiff Dep.") at 17:17-18:4.) Plaintiff and the father of her children, Roy Berger, were divorced in 2008, and their relationship has been acrimonious ever since. (Plaintiff Dep. 58:5-11.) Berger later remarried, and now lives with his wife

in Harrison Township, Michigan. (Plaintiff Dep. 12:10-11, 38:24-39:1.)

The youngest of Plaintiff's children is her son JB, who was 15 during the relevant time period. (Def.'s Mot. Ex. 3, Deposition of JB at 5:24-25.) Plaintiff and Berger share joint legal custody of JB: Plaintiff has physical custody and receives child support, and Berger has visitation rights. (Plaintiff Dep. 31:18-34:4; ECF No. 27, Pl.'s Mot. Ex. A, Judgment of Divorce.) The terms of the custody have changed frequently over the years—eight times, by Plaintiff's count—but the baseline arrangement at the relevant time was that Berger had visitation for half of the summers, every other weekend, and one mid-week day. Plaintiff testified that she typically let her children visit their father whenever they wanted to: for example, JB spent the entire summer of 2015 with his father. (Plaintiff Dep. 32:18-35:1.)

In May 2015, around the end of his eighth-grade year, JB asked Plaintiff to let him live with his father, claiming that the area where his father lived had a better school system and more job opportunities. Plaintiff testified that she refused his request because she did not believe his reasons were sincere. JB continued to ask, and continued to receive the same answer, until he left to spend the summer with Berger. (Plaintiff Dep. 46:24-48:13.)

When JB returned at the end of the summer to start his freshman year of high school, he pressed Plaintiff further on the prospect of living with his father, and around this time Berger began to contact Plaintiff about it as well. Plaintiff held fast

in refusing JB's requests because she "was looking to hear his reason, not looking to hear what was told to him." (Plaintiff Dep. 49:21-51:10.) On September 9, 2015, Berger filed a motion to change custody in the Lapeer County Circuit Court, and a hearing on the motion was scheduled for October 12. (Pl.'s Mot. Ex. B, Motion for Change of Custody; Plaintiff Dep. 100:23-101:10.)

### 2. September 30, 2015 incident

On the evening of Wednesday, September 30, 2015, JB's stepfather Philip Maley confronted JB over his failure to finish mowing the lawn. Maley told JB that he had certain responsibilities by virtue of his living in his mother and stepfather's house, to which JB replied that he only lived there because his mother would not let him live with his father. At a certain point Maley sent JB to his room for the night, and proceeded to relate the argument to Plaintiff. (Pl.'s Mot. Ex. H, Deposition of Philip Maley ("Maley Dep.") at 8:13-9:24; JB Dep. 7:14-8:1.) Plaintiff then went to JB's bedroom. (Plaintiff Dep. 66:6-19.)

What happened next in JB's bedroom is sharply disputed. Plaintiff testified that she "yelled at him," elaborating that "I told him that I had survived a childhood of abuse, three child births, two cancers and a divorce, and I wasn't going to have him talk to me like that in my house"—by which she meant "yelling and being defiant." (Plaintiff Dep. 65:15-67:4.) While Plaintiff admitted that she yelled at him "inches from his face," she asserted unequivocally that there was no physical

contact, testifying that she "never laid a finger on him." (Plaintiff Dep. 67:16-68:4, 72:15-19.) By JB's account, Plaintiff grabbed his shoulders, repeating the action several times as he shook her hands off of him; hit him "like twice" with her partly open hand, at least once in the face; and grabbed his neck once as "she was going for [his] shoulder." (JB Dep. 17:3-18:17.) Maley could hear Plaintiff and JB arguing from a room down the hall, and he testified that while he did not hear JB say anything that suggested he was being attacked, he could not say whether Plaintiff made physical contact with JB. (Maley Dep. 9:25-11:5.)

JB testified that after his mother left his room, "I was talking to my dad, telling him what happened. He asked if I wanted him to come get me. And I said, no, we can wait till tomorrow. He said, well, what happened? And I told him what happened, and he wanted pictures." (JB Dep. 14:12-16.) JB used a cell phone to take two pictures of his face, neck, and torso, which he then sent to his father through his stepsister. (JB Dep. 14:16-19; Def.'s Mot. Ex. 4, Photographs.) JB testified that Berger suggested they call the police, but that JB declined "[b]ecause if the cops did come and I had to stay, I didn't want it to get worse." (JB Dep. 25:7-11.) JB further testified that Plaintiff had not hit him before, but that in that moment he was afraid she might be angry enough to hit him again. (JB Dep. 17:1-18, 20:21-22, 25:12-18.) Berger agreed to meet JB at school the next day so that they could talk to the police there. (JB Dep. 25:21-26:2.)

### 3. Defendant's October 1, 2015 interviews of JB and Berger

The following morning, Berger met JB at his school. JB testified that Berger intended to take JB out of school to meet with police, but the school would not let him because he was not listed on JB's release forms. The principal called the local police for them, and after the first officer to respond determined that the incident was not within his jurisdiction, a call was placed to the St. Clair County Sheriff's Office. Defendant Welch was dispatched to the high school. (JB Dep. 26:19-27:13; Def.'s Mot. Ex. 5, Deposition of Nathan Welch 15:2-7.)

JB related to Defendant what had happened the night before and showed Defendant the pictures he had sent his father. Defendant testified that he did not see "marks on [JB] . . . indicating any type of injury." (JB Dep. 29:18-30:8; Welch Dep. 16:23-25, 39:6-8.) JB testified that he asked Defendant not to arrest his mother because his sister would need a ride home from school, but that he did ask Defendant "if there was any way I could stay with my dad till this was done, and he said yes." (JB Dep. 30:17-31:6.) More specifically, JB testified that Defendant "said I'll let you go home with your dad until court to find out what's going on." (JB Dep. 31:7-10.)

Defendant's Incident Report of the interview with JB states that according to JB, when his mother entered his room the previous night, she "did become very hostile towards him. He stated that he did put his hands up over his face. She did at that time begin swatting his hands and his arms. Stated that she did hit on his face

6

and as well as on his neck." (Def.'s Mot. Ex. 2, Incident Report at 4, Pg ID 197.)

Defendant noted in the Incident Report that Berger said "that there is a long history of his ex-wife, JAMIE, with anger." (*Id.*) The Incident Report then relates that Berger had been contacted by JB the previous night and received the pictures that JB took, and goes on to state that Berger told Defendant "that the reason that they have called now is because they are afraid for his son to go back to the residence. He does feel that it is unsafe for him to be there." (*Id.*) The Incident Report further states that Defendant advised Berger

> that he would do the report for child abuse/assault against [JB] from his mother JAMIE; did advise that he would forward a copy to Child Protective Services and also to the prosecutor's office. ROY was advised that he could take his son back to his residence due to the fact that he does go there every other weekend anyways and then until Child Protective Services could do an evaluation, [JB] could live with him for the time being. ROY did state that on October 12th, they do have a custody hearing for the judge to determine if [JB] can stay with him or if he has to stay with his mother.

(*Id.* at 4-5, Pg ID 197-98.)

### 4.     Defendant's October 1, 2015 interview of Plaintiff

Although JB's testimony and the Incident Report suggest that Defendant told JB he could temporarily stay with his father when they were still at the high school, Defendant himself testified that he made that decision after speaking with Plaintiff at her house later that same day. (Welch Dep. 15:15-16:2.) After interviewing JB

and Berger at the school, Defendant drove to Plaintiff's house, followed by JB and Berger in Berger's vehicle, to hear Plaintiff's side of the story. JB and Berger waited outside in the car during the interview. (Welch Dep. 17:1-7, 41:21-42:9.)

When she opened the door, Defendant said to Plaintiff that he was there because what he had heard from JB about the incident the night before. Plaintiff said that she had yelled at JB, but denied having hit him. (Plaintiff Dep. 79:8-22; Welch Dep. 17:6-13.) Plaintiff testified that she "said to [Defendant] that it was a ploy to try to go and live with his father and that it was made up, that it didn't happen. [Defendant] told me that he was not the judge and could not decide if it happened or not." (Plaintiff Dep. 79:24-80:2; *see also* Welch Dep. 20:10-13.) Defendant testified that Plaintiff became angry enough that her demeanor hindered the interview: "She did become very, we'll say, hostile in her mannerisms towards me at that point. . . . [W]ith her mannerisms the way they were, I attempted to have an interview with her the best that I could but was unable to." (Welch Dep. 17:8-16.) Based on the statements by JB and Berger, the pictures that JB had taken, and Defendant's interview with Plaintiff, Defendant concluded that if JB kept "staying in that house [he] was going to be the victim of an assault again." (Welch Dep. 23:6-13.)

Regarding his interview with Plaintiff, Defendant's Incident Report states:

> She stated that she does yell very loudly and very often, where she does not use any physical force. When asked if she used any physical force on son last night, she stated that she did not. When she was advised that

her son had pictures of red marks around his throat as well as on his face, she stated that he must have done them himself. She did state to undersigned deputy that this is a ploy so that her son [JB] can go stay with his father, ROY.

Undersigned deputy did advise her that that was in fact what was happening today, that [JB] was going to be staying with ROY until Child Protective Services could be notified and an investigation was completed. She did state that she understood. At that time she was advised that the report was going to be forwarded to Child Protective Services as well as to the prosecutor's office for review. She stated that that was fine. At that time she did allow her son to get whatever property he wanted outside the residence. And undersigned deputy as well as [JB] did clear the house.

(Incident Report at 5, Pg ID 198.)

### 5. St. Clair County Sheriff's Office policies and subsequent events

A St. Clair County Sheriff's Office Department Order entitled "Juvenile Removal Protocol" that was in effect at the relevant time set forth "[c]riteria for removing a child from a caregiver (anyone who is responsible for the care of the child)." (Def.'s Mot. Ex. 6, Juvenile Removal Protocol.) That section of the Juvenile Removal Protocol indicates that removal is permissible "[w]hen the child's immediate physical safety is in question (such as the child being struck in a domestic violence case)," and also "[w]hen the physical environment that the child is living in is not appropriate." (*Id.* at 1-2, Pg ID 237-38.) The same section states: "The standard of proof **is REASON TO BELIEVE. (Always err in favor of the child).**" (*Id.* at 2, Pg ID 238 (emphasis in original).) The Juvenile Removal Protocol further

states: "The Juvenile Code gives any law enforcement officer broad powers to remove a child from immediate danger without pre-approval by a court officer. It further directs officers to take into custody any child whose surroundings are such as to endanger his/her health, morals or welfare." (*Id.*)

Further, operating protocol for deputies in the St. Clair County Sheriff's Office at the relevant time was to dictate all incident reports into digital recorders that they carried with them; when a deputy's shift was over, the deputy would plug the recorder into a cradle, prompting the recorder to transmit all of the dictations the deputy had made into a software system, which in turn assigned them to typists in the department. (Def.'s Mot. Ex. 5, Deposition of Matthew Paulus at 10:6-11:15; Welch Dep. 11:17-13:24.) Deputies could designate incident reports as "priority" reports, which would then be assigned to typists more quickly. Standard practice for a deputy was to first indicate that a particular incident report was a priority report by pressing a button on the recorder, and then later to make a note on a dry-erase board at the station that there was a priority report in his or her device. Defendant testified that any report of a "domestic" like the incident with Plaintiff and JB would have to be a priority report. (Welch Dep. 28:5-29:13, 30:6-31:10, 39:9-40:10.)

After Defendant had interviewed Plaintiff and JB had left with Berger, Defendant returned to his car and dictated the Incident Report quoted above into his recorder. (Welch Dep. 11:17-12:11; 21:11-18.) Defendant testified that in dictating

the Incident Report, he instructed the typist to forward a copy to CPS; the Incident Report contains a line reading "Cc Child Protective Services" after Defendant's narrative. (Welch Dep. 24:10-19; Incident Report at 5, Pg ID 198.) Defendant further testified that after interviewing Plaintiff, he called a supervising sergeant, pursuant to policy, to tell the sergeant "about me removing the child from the house and giving . . . him to the dad that night, and to give him the heads up that the mom might . . . actually be calling him." (Welch Dep. 14:5-20.) The record does not indicate whether Defendant pressed the button on his device to designate the report as a priority report, and Defendant testified that while his standard practice in the situation would have been to make a note on the priority list at the station, he could not recall whether he did so in this particular case. (Welch Dep. 28:5-22, 30:6-10.)

Due to a technical error, Defendant's report did not upload to the system when he docked his recorder. (Welch Dep. 48:12-19; Paulus Dep. 20:4-18.) Unaware of this fact, Defendant then began an extended leave period that lasted approximately 14 days. (Welch Dep. 9:2-11:3.)

Later in the day on Thursday, October 1, 2015, Plaintiff called the Sheriff's Office and was transferred to Matthew Paulus, the day-shift lieutenant on that date. She explained to Paulus what had happened, and Paulus responded that he did not have any information about the incident. When she called back the next morning, she spoke to Paulus again and received the same answer, after which Paulus

suggested she call CPS. (Plaintiff Dep. 90:11-92:6.) Plaintiff did so, and after asking CPS to send someone to investigate her and her home, she was told by CPS that "they couldn't send anybody out because they hadn't received the case against [her]." (Plaintiff Dep. 92:7-16.) CPS suggested Plaintiff call the Lapeer County Friend of the Court (*i.e.,* an arm of the court in which the divorce and custody proceedings were held) "to see if there was an emergency hearing the previous day to find out about [JB]'s removal." (Plaintiff Dep. 92:17-20.) When she did so, the Lapeer County Friend of the Court informed Plaintiff that they did not have any judgments, rulings, or emergency hearings that would have authorized JB's removal from Plaintiff's custody, and suggested she call the St. Clair County Circuit Court. She did, and was given the same answer. (Plaintiff Dep. 93:7-17.) Plaintiff then called CPS back, "[b]egging them to come out and investigate me. And they kept telling me they couldn't until they received a report." (Plaintiff Dep. 93:17-25.) Plaintiff called the St. Clair County Sheriff's Office again, and was again transferred to Paulus. According to Plaintiff's testimony, Paulus said "'Lady, if you're too stupid to remember what I told you three hours ago, you don't deserve your son back,'" whereupon Plaintiff terminated the call. (Plaintiff Dep. 94:5-21.)

Paulus testified that at some point after one of his conversations with Plaintiff, he searched through several internal databases and found that Defendant Welch was the deputy who responded to the incident. (Paulus Dep. 35:15-38:21.) Paulus then

contacted Defendant, retrieved Defendant's recorder from his gear bag, and uploaded the report to the system. (Paulus Dep. 20:8-24.) The report itself indicates that Defendant's request that the prosecutor charge Plaintiff was prepared on Saturday, October 3, which in turn suggests that this was the date that the report was transcribed. (Incident Report at 5, Pg ID 198.) Paulus also contacted CPS directly on Saturday, October 3.[1] (Paulus Dep. 14:20-15:2.)

CPS informed Plaintiff on Monday, October 5 that they had received the report and would be sending a representative to her house. (Plaintiff Dep. 96:12-21.) Plaintiff's deposition testimony indicates that CPS employee Clarence Miller did visit Plaintiff on either October 5 or October 6; that Miller thereafter met with JB and Berger on October 6; and that these facts are memorialized in a CPS investigation report. (Plaintiff Dep. 96:22-97:21.) Neither that report nor any other information about these meetings is in the record.

JB stayed with Berger for a total of eleven days, until the scheduled October

---

[1] The record does not establish the exact date on which Paulus began to look into the situation personally, though his testimony suggests that it was shortly after one of his phone conversations with Plaintiff. (Paulus Dep. 35:15-36:15.) Philip Maley, Plaintiff's husband, testified that he began calling the Sheriff's Office himself after Paulus "yelled at [Plaintiff] and told her . . . you don't deserve to have your son back." (Maley Dep. 18:9-13.) Maley advised Plaintiff to tell the Sheriff's Office that since the Sheriff's Office had no information on the incident, Plaintiff and Maley had no way of knowing if Defendant was in fact a legitimate law enforcement officer, as opposed to a confederate of Berger's—and this suggestion, Maley testified, is what finally "got somebody's attention." (Maley Dep. 13:21-14:9.)

12, 2015 hearing on Berger's motion to change custody. Plaintiff testified that during that time she was concerned that JB would not be sufficiently supervised, but also testified that she did not believe him to be unsafe. (Plaintiff Dep. 98:10-100:22.)

Plaintiff, Berger, and JB attended the October 12, 2015 hearing before Judge Justus C. Scott, who had not been made aware of the events of the past twelve days. Plaintiff testified that at the hearing, Judge Scott stated that he would refer Berger's motion (filed in early September) to a Friend of the Court referee, and that he would not otherwise alter the governing custody order. Plaintiff further testified that consistently with that order, Judge Scott ordered Berger to return JB to Plaintiff's custody, and that Berger did so later that day. (Plaintiff Dep. 100:23-107:20.) JB still lives with Plaintiff, and their relationship has been harmonious since the events described above. (Plaintiff Dep. 119:11-25; JB Dep. 38:2-7; Maley Dep. 23:2-15.)

On October 1, 2015, Plaintiff was charged in the St. Clair County Circuit Court with one count of domestic violence in Case Number 15P07852SM. The case was dismissed by directed verdict after a jury trial on January 28, 2016.

**B.    Procedural History**

Plaintiff filed this lawsuit on March 2, 2016, asserting four claims under 42 U.S.C. § 1983: violation of procedural due process against Defendant Welch (Count I), violation of substantive due process against Defendant Welch (Count II), municipal liability against former defendant County of St. Clair (Count III), and a

request for injunctive relief against former defendant County of St. Clair (Count IV).

Shortly after the close of discovery, on January 31, 2017, Defendant Welch filed what he styled a "Motion to Dismiss" pursuant to Fed. R. Civ. P. 56. (ECF No. 19, Def.'s Mot.) Plaintiff filed what she styled as a "Motion for Partial Summary Judgment" the following day (ECF No. 20), and on the day after that the parties stipulated to the dismissal of all claims against St. Clair County (ECF No. 21), leaving only Counts I and II against Defendant Welch in the action. The parties responded to each other's Motions on February 28, 2017.[2] (ECF Nos. 24, 25.)

On May 25, 2017, the Court entered an Order striking Plaintiff's Motion and both parties' Responses, having reviewed the submissions and found that they were "replete with multiple violations of E.D. Mich. L.R. 5.1 and 7.1, the Federal Rules of Civil Procedure, and general common sense . . . ." (ECF No. 26 at 1, Pg ID 502.) The Court therefore directed Plaintiff to re-file her Motion as well as her Response to Defendant's Motion, directed Defendant to re-file his Response after Plaintiff re-filed her Motion, and made clear that the parties were neither required to re-file exhibits nor permitted to change the substance of their legal arguments as presented in their original submissions. The Court also noted that no reply briefs had been filed

---

[2] Defendant's "Motion to Dismiss" actually seeks summary judgment pursuant to Federal Rule of Civil Procedure 56, and Plaintiff's "Motion for Partial Summary Judgment" actually seeks summary judgment on the only two claims still in this action. The Court will thus construe both Motions simply as Motions for Summary Judgment, and will refer to them as such in the remainder of this Opinion and Order.

in the original briefing, and for that reason ordered that none would be permitted on re-briefing. (ECF No. 26 at 2-5, Pg ID 503-06.) The parties complied with the Court's May 25, 2017 Order in a timely fashion. (ECF No. 27, Pl.'s Mot.; ECF No. 29, Pl.'s Resp.; ECF No. 30, Def.'s Resp.)

The Court held a hearing on both parties' Motions for Summary Judgment on September 20, 2017, and now issues the following ruling.

## II. LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

When presented with cross-motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). "The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute." *Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (citing *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). In this context, a plaintiff and a defendant have different burdens:

> In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to

prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense").

The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would entitled to a directed verdict at trial." William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely*, 150 F. Supp. 3d at 849-50.

Finally, all evidence in opposition to a motion for summary judgment must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.").

## III.    DISCUSSION

Since the parties agreed to dismiss St. Clair County as a defendant, the only two claims in this lawsuit are Plaintiff's procedural due process claim asserted in Count I of the Complaint, and her substantive due process claim asserted in Count II of the Complaint. Plaintiff asserts both claims against Defendant Welch under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

Different legal standards govern these two claims. "It is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (internal citations omitted). The Sixth Circuit has explained that the differences between those two rights

> and the corresponding scope of the duties imposed on government . . . are significant. While procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests, substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose.

*Id.* at 557-58 (internal citations omitted).

The law is equally clear that to maintain either type of due process claim in a § 1983 action, the plaintiff must show more than mere negligence by the defendant. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015)

(internal quotation marks omitted) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). The United States Supreme Court clearly established this principle as early as 1986, in a pair of companion cases involving § 1983 claims brought by prisoners alleging that they suffered physical injuries due to negligent acts or omissions by prison officials. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."); *see also Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("As we held in *Daniels*, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials.").

In the years since *Daniels* and *Davidson* were decided, the Supreme Court has made clear that this heightened standard for constitutional due process torts by state actors is not limited to lawsuits in the prison context. *See, e.g., DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (the Fourteenth Amendment does not require the state "to protect the life, liberty, and property of its citizens against invasion by private actors"); *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998) (injuries in high-speed chases caused by police officers who have "no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment"); *Collins v. City of Harker*

*Heights, Tex.*, 503 U.S. 115, 125–26 (1992) (the Fourteenth Amendment imposes no duty on government employers to provide a safe work environment).

In line with these decisions, the Sixth Circuit has "interpreted *Daniels* to require that, to state a cognizable section 1983 claim based on the deprivation of procedural due process, conduct must be grossly negligent, deliberately indifferent, or intentional." *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996) (collecting cases). Substantive due process claims also require a showing of conduct by a state actor that is more egregious than simple negligence. *See Mitchell v. McNeil*, 487 F.3d 374, 377-78 (6th Cir. 2007) ("Concerned that the Due Process Clause . . . not become a 'font of tort law to be superimposed upon whatever systems may already be administered by the States,' the Supreme Court has made it clear that mere negligence on the part of governments and their agents does not provide plaintiffs with a ticket to federal court to seek substantive due process relief.") (internal citations omitted) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

The precedents cited above significantly narrow the potential factual bases for both of Plaintiff's due process claims. Plaintiff does not argue that Defendant's failure to transmit his incident report to CPS was intentional, reckless, or even grossly negligent—nor could she persuasively do so absent any evidence that the transmission error was anything but a technical glitch. Similarly, even if this Court were to assume in Plaintiff's favor that Defendant forgot to designate the Incident

Report as a "priority report," there is no colorable argument to be made that such an oversight would rise to the level of gross negligence. *See Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012) ("The Michigan Supreme Court held gross negligence is 'akin to willful, wanton, or reckless misconduct.' . . . A valid claim for gross negligence requires 'proof of conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'") (internal quotation marks and citations omitted) (quoting *Dedes v. Asch*, 446 Mich. 99, 110 (1994) and *Maiden v. Rozwood*, 461 Mich. 109, 122 (1999)). Thus, neither the Incident Report transmission failure nor Defendant's failure to designate the Incident Report as a "priority report"—again, assuming Defendant did in fact fail to designate it as such—can serve as the factual predicate for a Fourteenth Amendment due process claim.

The scope of the analysis here is narrowed further by the fact that St. Clair County is no longer a defendant in this action, and further yet by the fact that Plaintiff does not challenge the constitutionality of any Michigan law, municipal ordinance, or St. Clair County Sheriff's Office policy that justified Defendant's decision to let JB stay with his father. It follows that if Plaintiff has a due process claim against Defendant Welch specifically, it can be based only on his decision to allow JB to stay in Berger's custody pending an investigation by CPS, notwithstanding Defendant's mistaken belief that he had taken the steps necessary to transmit the Incident Report to CPS by the time he finished his shift on October 1, 2015.

Defendant argues that both of Plaintiff's due process claims are barred by the doctrine of qualified immunity. For the reasons set forth below, this Court agrees, and will therefore grant Defendant's Motion for Summary Judgment, and deny Plaintiff's Motion for Summary Judgment.

## A.    Defendant's Motion for Summary Judgment

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The qualified immunity doctrine requires the court to determine: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* at 232 (citations omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Clemente v. Vaslo,* 679 F.3d 482, 490 (6th Cir. 2012) (quoting

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The Sixth Circuit has emphasized that "this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. . . . [T]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks and citations omitted). The doctrine of qualified immunity "focuses on 'the objective reasonableness of an official's conduct, as measured by reference to clearly established law' to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) (quoting *Harlow*, 457 U.S. at 818).

"Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)). Once the defendant has done so, the plaintiff then "bear[s] the burden of showing the claimed right was clearly established." *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009). The plaintiff need not cite "'a case directly on point' [to demonstrate] that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kent v. Oakland Cty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013)). The inquiry requires

the plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" in order to show that the right was clearly established. *Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013). The Supreme Court has recognized as a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Under the "clearly established" prong of the qualified immunity standard, Defendant is entitled to summary judgment unless Plaintiff can point to controlling authority or a clear consensus of persuasive authority demonstrating that under clearly established law, an objectively reasonable officer in Defendant's position would have known that his actions violated Plaintiff's procedural or substantive due process rights. Plaintiff has not met this burden. For that reason, the Court will grant Defendant's Motion for Summary Judgment.

### 1.    Procedural Due Process (Count I)

The doctrine of procedural due process applies only to claims that allege "the deprivation of constitutionally protected liberty or property interests." *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir. 1983) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)). When such a deprivation has been shown, "a court must determine

whether [the] plaintiff was afforded adequate due process protection. 'Once it is determined that due process applies, the question remains what process is due.'" *Staples*, 706 F.2d at 988 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Under clearly established law, the first prong of this standard is satisfied here. The Sixth Circuit considers it "axiomatic that a parent has a liberty interest in the freedom of personal choice in matters of family life in which the state cannot interfere." *Doe v. Staples*, 706 F.2d 985, 988–89 (6th Cir. 1983) (citing *Smith v. Organization of Foster Families*, 431 U.S. 816 (1977) and *Stanley v. Illinois*, 405 U.S. 645 (1972)); *see also Barber v. Miller*, 809 F.3d 840, 848 (6th Cir. 2015) ("In this circuit, '[a] parent is necessarily deprived of his or her right to custody and control of their child, either permanently or temporarily, when a child is removed from the home.'") (quoting *Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006)). There is little question that the liberty interest at issue in this case implicates the Due Process Clause of the Fourteenth Amendment.

The second prong of the standard presents a far thornier issue. The question of "what process is due" necessitates a case-by-case analysis, since "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "[D]ue process does not require a formal and full-blown adversary hearing in every case. . . . The formality and procedural requisites for the hearing can vary, depending upon the importance

of the interests involved and the nature of the subsequent proceedings." *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 811 (W.D. Mich. 2004). Broadly speaking, "'[c]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'" *Morrissey*, 408 U.S. at 481 (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)).

Necessarily flexible though the standard is, there is case law that offers guidance on how to implement it in the specific context of child removal. In *Doe v. Staples*, 706 F.2d 985 (6th Cir. 1983), for example, the Sixth Circuit held that in the typical summary child removal case, due process requires that

> 1) The parents be given notice prior to the removal of the child (at the time of the removal when exigent circumstances exist or promptly thereafter) stating the reasons for the removal;
>
> 2) The parents be given a full opportunity at the hearing to present witnesses and evidence on their behalf;
>
> 3) The parents may have a retained attorney at the hearing;
>
> 4) The hearing must be conducted by a neutral and detached hearing officer; and
>
> 5) The hearing officer conducting the removal hearing must state in writing the decision reached and the reasons upon which the decision is based.

*Id.* at 990-91. But importantly, given the inherent flexibility of the due process inquiry, the Sixth Circuit has not interpreted the five procedures identified in *Staples*

as universal requirements. *See, e.g., Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998) (citing *Staples* for the proposition that "procedural due process requires that parent have notice and opportunity for a hearing before [the] state may deprive parent of their fundamental interest in keeping physical custody of their children"); *Smith v. Williams-Ash*, 173 F. App'x 363, 366 (6th Cir. 2005) (noting that while the final termination of parental rights generally requires a pre-deprivation hearing, *Staples* established that "[e]ven a temporary deprivation of physical custody requires a hearing within a reasonable time").

Moreover, the law is clear that the presence of exigent circumstances can lessen "what process is due" under the Fourteenth Amendment. In 2004, a court in the Western District of Michigan noted that while the Sixth Circuit had not "expressly ruled on the issue" as of that time, "law from other circuits suggests that at a minimum, due process requires a written order *unless exigent circumstances are present*." *O'Donnell*, 335 F. Supp. 2d at 812 (emphasis added) (collecting cases). Since then, the Sixth Circuit has held that "[i]n addition to providing an exception to the warrant requirement under the Fourth Amendment, exigent circumstances may alter the notice and hearing requirements typically required under the Fourteenth Amendment in child-removal cases." *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013). "Preventing imminent or ongoing physical abuse within a home qualifies as an exigent circumstance." *Id.*

(internal quotation marks omitted) (quoting *Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010)).

The Michigan statute that Defendant argues authorized his actions employs an "exigent circumstances" standard akin to that recognized in *O'Donnell* and *Kovacic*, and sets forth post-deprivation procedures:

> (1) If there is reasonable cause to believe that a child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and the child's immediate removal from those surroundings is necessary to protect the child's health and safety, an officer may, without a court order, immediately take that child into protective custody. An officer who takes a child into protective custody under this section shall immediately notify the department of human services. While awaiting the arrival of the department of human services, the child shall not be held in a detention facility.
>
> (2) If a child taken into protective custody under this section is not released, the officer or the department of human services shall immediately contact the designated judge or referee, as provided in subsection (3), to seek a court order for placement of the child pending a preliminary hearing.
>
> (3) A judge or referee shall be designated as the contact when a placement order is sought for a child in protective custody under this section. . . . When a placement order is issued by a designated referee, the order shall take effect as an interim order pending a preliminary hearing.
>
> (4) As used in this section, "officer" means a local police officer, sheriff or deputy sheriff, state police officer, or county agent or probation officer of a court of record.

Mich. Comp. Laws § 712A.14a. *See also* Mich. Ct. R. 3.963(A) (containing materially identical provisions to those set forth in § 712A.14a).[3]

The extent to which Defendant complied with § 712A.14a, a state statute, does not determine the extent to which he complied with federal constitutional due process requirements. *See Jon Jon's Inc. v. City of Warren*, 162 F. Supp. 3d 592, 602 (E.D. Mich. 2016) ("The Supreme Court has explained that the question regarding what process is due is not answered by state law or local ordinances but by constitutional benchmarks.") (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541–42 (1985)), *aff'd*, 700 F. App'x 436 (6th Cir. 2017). § 712A.14a is still highly relevant to this analysis, however, because it clarifies the scope of Defendant's role in the larger legal framework that Plaintiff claims interfered with her rights. For this reason, § 712A.14a also clarifies the scope of Defendant's potential liability. The inquiry into what process is due, after all, "must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'" *Morrissey*, 408 U.S. at 481. That Plaintiff's constitutionally protected liberty interest was affected is not in question. But § 712A.14a indicates that a law enforcement officer's responsibilities in circumstances like this include making the initial risk-of-harm

---

[3] Although Plaintiff does not argue that Defendant was not acting within the scope of his discretionary authority when the relevant events took place, *see Rich*, 955 F.2d at 1095, these provisions leave no doubt that he was.

assessment, taking the child into protective custody, notifying the department of human services (*i.e.*, CPS), and refraining from holding the child in a detention facility. Defendant cannot incur liability for due process violations that he did not commit himself. *See Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 730 (6th Cir. 2011) (defendant social worker did not violate plaintiff's procedural due process rights where the juvenile court, a separate state entity, was responsible for the proceedings that were alleged to be deficient). Consequently, Defendant cannot be held liable for any absence or delay of a post-deprivation hearing, or any other post-deprivation process.

The dispositive question as to Plaintiff's procedural due process claim, then, is whether clearly established law—defined as either "controlling authority" or "a robust consensus of cases of persuasive authority," *Hidden Village*, 734 F.3d at 529—would make it apparent to a reasonable officer in Defendant's position that his placement of JB in Berger's custody pending a CPS investigation violated Plaintiff's procedural due process rights. Under the precedents summarized above, the reasonableness of Defendant's actions depends on several distinct considerations: (1) whether "exigent circumstances" were present; (2) if so (or even if not), whether Defendant's interviewing Plaintiff to "gain her side of the story" (Welch Dep. 42:8-9) *itself* was sufficient notice, opportunity to be heard, or both; and (3) whether Defendant's allowing JB to stay with his father, with whom Plaintiff shared joint

legal custody of JB, was a less serious deprivation of Plaintiff's liberty interest than she would have suffered had Defendant taken JB into protective custody himself.

To overcome Defendant's qualified immunity defense, Plaintiff must cite precedent, or at least ample persuasive authority, that answers these questions in the negative. Plaintiff is required, in other words, to show that clearly established law places the particular (and fairly unique) facts of this case squarely on the wrong side of the constitutional line. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (explaining that the Supreme Court has "stressed the need [for a plaintiff] to identify a case where an officer acting under similar circumstances ... was held to have violated" the constitutional right in question, and that "[w]hile there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action committed by the defendant] beyond debate") (alteration in original) (internal quotation marks omitted).

Plaintiff has not met this burden. The only remotely "particularized" case that she cites to support her claim that "[t]he actions of Defendant[] were clearly objectively unreasonable" (Pl.'s Mot. at 22, Pg ID 538) is *O'Donnell v. Brown*, 335 F. Supp. 2d 787 (W.D. Mich. 2004), but her general citation to that decision does not support such a finding. To begin with, *O'Donnell* is factually distinguishable from this case on exigency grounds alone: the court in *O'Donnell* found that exigent circumstances did not justify warrantless entry into a home in which four children

(ranging from 12 years old to six months old) had been temporarily left by themselves, because there was no non-speculative indication of any actual or likely harm to any of the children, and because several of the defendants had even admitted "that they did *not* believe that the situation was serious enough to be considered exigent." *Id.* at 805-06. Here, Defendant had evidence to support a belief that JB had suffered or would likely suffer physical harm. Whether this was ultimately true, or even whether the evidence before Defendant at the time would have been sufficient to prove it true in any legal proceeding, is not at issue here. For present purposes it is enough to find that *O'Donnell* cannot have put Defendant on notice that the circumstances he confronted were not exigent as a matter of law.

In the same vein, the defendant state officials in *O'Donnell* did not have contact with the custodial parents prior to committing the unconstitutional deprivation alleged in that case, as they were away on a weekend business trip when it took place. *See id.* at 798-800. Nor did *O'Donnell* involve the transfer of a child to the temporary custody of a parent or guardian who shared joint legal custody of the child with the plaintiff. *See id.* For these reasons too, *O'Donnell* is unavailing to Plaintiff's argument that Defendant may not invoke qualified immunity because clearly established law put him on notice that his actions infringed Plaintiff's constitutional rights.

To whatever extent *O'Donnell* represents clearly established law to begin with, it is not sufficiently "particularized" to the facts of this case to defeat Defendant's qualified immunity defense. Plaintiff has cited no other decisions specifically to support her argument that Defendant's actions were objectively unreasonable enough under clearly established law to disentitle him to qualified immunity. As Plaintiff has not demonstrated the existence of clearly established law that would have made it evident to a reasonable officer in Defendant's position that his actions violated Plaintiff's procedural due process rights, Defendant is entitled to qualified immunity. The Court will therefore grant Defendant's Motion for Summary Judgment as to Plaintiff's procedural due process claim.

## 2.  Substantive Due Process (Count II)

The Sixth Circuit has explained in the child-custody context that "[s]ubstantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 727 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)). Substantive due process claims that are expressly identified as concerning specific constitutional rights fall within the latter category. *See Pittman*, 640 F.3d at 727 & n.6 ("[Plaintiff] premises his substantive due process claim on the deprivation of

his fundamental liberty interest in parenting [his son], so his claim is of the first type. . . . [Plaintiff] clearly claims a substantive due process violation based on the alleged deprivation of his fundamental liberty interest in family integrity, not on allegedly conscience-shocking conduct."); *see also O'Donnell*, 335 F. Supp. at 821 ("[T]he 'shocks the conscience' test is only one of two tests by which substantive due process is examined, and it is used when plaintiffs do not allege the violation of a specific protected liberty or property interest. Where, as here, Plaintiffs have alleged the violation of a recognized liberty interest, family integrity, the Court applies the second substantive due process test, which requires a compelling government interest and narrowly tailored conduct.") (internal citations omitted).

"While the Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship, that right is neither absolute nor unqualified." *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013) (internal quotation marks and citations omitted). "Governmental entities have a 'traditional and transcendent interest' in protecting children within their jurisdiction from abuse." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006) (quoting *Maryland v. Craig*, 497 U.S. 836, 855 (1990)). "Thus, 'although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is necessary as against

the parents themselves.'" *Id.* (quoting *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999)).

In short, "where the state removes a child from parental custody, the stage is set for the clash between the state's 'compelling' interest in protecting children from abuse and the qualified right to family association." *Kolley v. Adult Protective Servs.*, 786 F. Supp. 2d 1277, 1292 (E.D. Mich. 2011). In the Sixth Circuit, this conflict has commonly arisen in cases involving claims against social workers or child-protective-services agencies sued for actions that they took in connection with custody proceedings. What these cases establish is that where a final custody decision is in the hands of a court, social workers and child-protective-services agencies cannot be liable for a substantive due process violation based on their participation in the proceedings that lead to that legal determination. In *Pittman*, for example, the Sixth Circuit held that a social worker's alleged misrepresentations to her agency regarding the plaintiff father, alleged misrepresentations to the plaintiff himself, and other alleged conduct that the plaintiff claimed prevented him from fully participating in custody proceedings did not amount to a substantive due process violation, because the agency, like the social worker herself, was

> merely a party to the juvenile court proceedings, tasked with presenting to the juvenile court its recommendation as to the appropriate course of action in a particular case. Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive Pittman of his fundamental right.

36

*Pittman*, 640 F.3d at 729.

The Sixth Circuit has consistently cited *Pittman* for the same principle in subsequent cases with similar facts. *See, e.g., Teets v. Cuyahoga Cty., Ohio*, 460 F. App'x 498, 502 (6th Cir. 2012) ("Because Ohio law refers custody decisions to the juvenile court, which has independent authority to conduct hearings and collect evidence, we held that even intentional misrepresentations by a social worker during an investigation leading up to Ohio custody proceedings do not violate the parent's substantive due process rights because the social worker has no independent ability to institute the alleged deprivation.") (citing *Pittman*, 640 F.3d at 729); *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 586 (6th Cir. 2013) ("Although *Pittman* and *Teets* involved Ohio law, Michigan courts also have the ultimate decision-making power on custody and guardian appointment . . . Each of the allegations in the Kolleys' amended complaint have to do with the defendants' actions before the court decided to deny Joseph Kolley visitation rights. Despite the alleged misrepresentations, the court was the final decision-maker regarding Jena's custody decisions. The Kolleys' substantive due process claim fails.") (citing *Pittman*, 640 F.3d at 729); *Palmer v. Adams*, 517 F. App'x 308, 310 (6th Cir. 2013) ("[A]ny constitutional deprivation resulting from the actual termination of Palmer's guardianship rights and removal of Kaniyah from Palmer's home would have been attributable to actions taken by the family court, rather than actions taken by [the

defendant social worker].") (citing *Pittman*, 640 F.3d at 729).

The *Pittman* line of authority does not directly control here, since the instant case concerns a stage of custody proceedings that precedes the social-worker activities that were at issue in those cases: namely, the decision of a law enforcement officer to temporarily remove a child from custody pursuant to state law based on a perceived risk of harm to the child, and then to hand the case off to a child-protective-services agency. But *Pittman* and its progeny at least indirectly cast doubt on the viability of a substantive due process claim against the officer in these circumstances. This is because those cases appear to stand for the general proposition that the type of serious deprivation of fundamental rights that substantive due process is concerned with—as distinct from the question of whether the aggrieved individual was afforded sufficient protective legal procedures, which is the focus of procedural due process—can only be committed by the court tasked with making the ultimate custody determination, rather than the state agents that participate in the proceedings that lead to that determination.

Neither of the parties in this action has cited any decision directly on point here—which is to say, a decision analyzing the potential substantive due process liability of a law enforcement officer who, based on a perception of exigent circumstances, temporarily transfers a minor child from the physical custody of one parent to the physical custody of another parent who shares joint legal custody,

pending investigation of the matter by a child-protective-services agency. Indeed, as far as this Court is aware, this issue has not been confronted in any Sixth Circuit decision, or in any published decision by a district court within the Sixth Circuit. Even so, this Court finds one 2011 decision by the United States District Court for the Northern District of Ohio to be instructive here, if indirectly so. *See generally Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754 (N.D. Ohio 2011), *aff'd and remanded*, 724 F.3d 687 (6th Cir. 2013).

*Kovacic* dealt with the claims of two children that various constitutional rights of theirs had been violated by the Cuyahoga County Department of Children and Family Services and several of its employees, when they effected a warrantless entry into the plaintiffs' home and removed them from their mother's custody, resulting in a period of separation that ultimately lasted ten months. *See id.* at 763. The court in *Kovacic* held that the plaintiffs could not maintain a substantive due process claim for several reasons. First, the court found that initial seizure and removal of the children could not support a Fourteenth Amendment substantive due process claim, because a constitutional claim on those factual grounds could only be properly asserted under the Fourth Amendment.[4] *See id.* at 779 (". . . [A]s the Supreme Court has recently reiterated, substantive due process should not be called upon when a

_____

[4] Plaintiff has made no argument in support of any Fourth Amendment claim against Defendant in this action.

39

specific constitutional provision protects the right allegedly infringed upon.")
(internal quotation marks omitted) (quoting *Brokaw v. Mercer Cty.*, 235 F.3d 1000,
1017 (7th Cir. 2000)). Second, the court rejected the plaintiffs' contention that the
defendants were liable under substantive due process doctrine for the entire ten-
month separation period. Specifically, the court noted that "[a]t most, defendants are
responsible only for the three days of separation that passed between the removal
and the first juvenile court hearing," and concluded that under *Pittman*, "such a
temporary deprivation does not rise to a violation of substantive due process. It was
the juvenile court, not the County and its employees, which perpetrated the ten-
month deprivation of plaintiffs' right to family integrity, if any." *See id.* at 781 ("The
juvenile court, and not defendants, had the ultimate decision-making power with
respect to the placement and custody of the Kovacic children. Accordingly, the
juvenile court alone could deprive plaintiffs of their fundamental right during the
claimed ten-month period.") (citing *Pittman*, 640 F.3d at 729). Third, the court found
that "[a]s to the three days of separation between the removal and the first juvenile
court proceeding, numerous courts have held that such a temporary deprivation does
not violate substantive due process rights, even if plaintiffs had been given all the
procedural protections to which they were entitled." *Id.* at 782 (collecting cases).
Finally, the court determined, "there is no evidence that defendants acted with
willfulness or intent to adversely interfere or affect the familial relationship between

plaintiffs and their mother. 'Absent such evidence [...] no genuine issue of material fact exists as to plaintiffs' substantive due process claims.'" *Id.* (alterations in original) (quoting *J.B. v. Washington Cty.*, 127 F.3d 919, 927–28 (10th Cir. 1997)).

*Kovacic*, along with the Sixth Circuit cases concerning social workers discussed above, creates substantial doubt as to whether Defendant's conduct in this case violated Plaintiff's substantive due process rights at all. In the qualified immunity analysis, it is Plaintiff's burden to cite precedent or strong persuasive authority clearly establishing that her rights *were* so violated, and she has failed to do this. As with her argument regarding her procedural due process claim, the only factually "particularized" case that Plaintiff has cited is *O'Donnell*. Here again, even if *O'Donnell* was binding precedent or somehow constituted "a robust consensus of cases of persuasive authority," *Hidden Village*, 734 F.3d at 529, it is too factually dissimilar to this case to defeat Defendant's qualified immunity defense. The court in *O'Donnell* applied a "strict scrutiny" test to the defendants' decision to remove the children in that case, and thus examined whether that decision was "narrowly tailored to a compelling governmental interest." *O'Donnell*, 335 F. Supp. 2d at 821 (quoting *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)). The court concluded that the government had not shown the presence of a compelling interest since there was no evidence of exigent circumstances, and had not shown that the removal was narrowly tailored because there were less intrusive options to protect the young

children than removal—namely, allowing them to stay with their 16-year-old sibling, with a neighbor, or with their pastor, all of whom were available to serve as temporary guardians. *See id.* at 821-22. *O'Donnell* is distinguishable from this case on the exigency issue for the reasons discussed *supra*, however, and it is far from apparent that there were any more narrowly tailored means for Defendant to protect JB from the risk of harm that he perceived than to let him go home with his father.[5]

Because Plaintiff has failed to demonstrate that a reasonable officer in Defendant's position would have been aware that his actions violated Plaintiff's substantive due process rights, Defendant is entitled to qualified immunity. Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's substantive due process claim.

## B.     Plaintiff's Motion for Summary Judgment

The arguments that the parties have set forth in their Motions for Summary Judgment are materially identical to the arguments that they have presented in their Responses in opposition to the other party's Motions for Summary Judgment. For

_____

[5] In fact, *O'Donnell* may do more harm to Plaintiff's substantive due process claim than good: the court in *O'Donnell* explained that "[a]lthough the procedural and substantive due process claims in this case implicate the same liberty interest, the substantive claim requires a deprivation of greater severity." *Id.* at 810. If *O'Donnell* were controlling, Plaintiff's substantive due process claim could fail simply because the same facts that Plaintiff premises her substantive due process claim upon were themselves insufficient to support a procedural due process claim.

the reasons detailed above, this Court has concluded that viewing the facts in the light most favorable to Plaintiff, Defendant is entitled to judgment as a matter of law.

Nothing in the record or in the parties' submissions suggests that this analysis would change in Plaintiff's favor if all reasonable factual inferences were drawn against her, as the Court would be required to do in adjudicating her Motion for Summary Judgment. For that reason, the Court will deny Plaintiff's Motion for Summary Judgment.

## IV.     CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendant's Motion for Summary Judgment (ECF No. 19), and DENIES Plaintiff's Motion for Summary Judgment (ECF No. 27).

IT IS SO ORDERED.


Dated:  March 23, 2018               s/Paul D. Borman
                                     Paul D. Borman
                                     United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 23, 2018.

                                     s/D. Tofil
                                     Deborah Tofil, Case Manager